**Brian Donald Potter, OSB No. 843259**
Law Office of Brian Donald Potter
3236 S Kelly Avenue, Suite 101
Portland, Oregon 97239-4679
Telephone: (503) 223-2612
Facsimile: (503) 222-5779
dpotter@nwemployeelaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **WILLIAM E. SCHLEVE,** | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | Employee Retirement Income Security Act (ERISA) |
| **COURTESY FORD LINCOLN,** assumed business name of RON BOYER**;** and **COURTESY FORD,** assumed business name of R.K.B., INC., a Colorado corporation**,** | Consolidated Omnibus Budget Reconciliation Act (COBRA) |
| Defendants. | |

Plaintiff alleges:

## I. JURISDICTION AND VENUE

1.

Plaintiff brings this civil enforcement action pursuant to Sections 502(a)(1)(A), (a)(3) and

( c)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"),  29 USC §§

1132(a)(1)(A), (a)(3) and ( c)(1).  This Court has jurisdiction of this action pursuant to ERISA §502(e) and (f), 29 USC § 1132(e) and (f).

2.

All of the alleged acts occurred in the District of Oregon.

II. <u>PARTIES</u>

3.

Defendant Ron Boyer is an individual who at all material times has owned and operated a motor vehicle dealership at 1313 N.E. 122nd Avenue, Portland, Oregon under the assumed business name of Courtesy Ford Lincoln.  Defendant Ron Boyer at all material times has operated his motor vehicle dealership in conjunction with Defendant R.K.B., Inc., which at all material times also has owned and operated a motor vehicle dealership at 1313 N.E. 122nd Avenue, Portland, Oregon under the assumed business name of Courtesy Ford.

4.

Defendant R.K.B., Inc. is, and at all material times was, a Colorado corporation doing business as a motor vehicle dealership at 1313 N.E. 122nd Avenue, Portland, Oregon under the assumed business name registered to it of Courtesy Ford.  Defendant R.K.B., Inc at all material times has operated its motor vehicle dealership in conjunction with Defendant Ron Boyer who at all material times also has owned and operated a motor vehicle dealership at 1313 N.E. 122nd Avenue, Portland, Oregon under the assumed business name of Courtesy Ford Lincoln. Defendants Ron Boyer and R.K.B., Inc. collectively are hereafter referred to as "Courtesy."

5.

Courtesy at all material times was an "employer" as defined by ERISA §3(5), 29 USC § 1002(5); a "plan sponsor" as defined by ERISA §3(16)(B)( i), 29  USC § 1002(16)(B)(i); a

"fiduciary" as defined by ERISA §3(21), 29 USC § 1002(21); and the "administrator" of an

employee welfare plan as defined by ERISA §3(16)(A), 29 USC § 1002(16)(A).

6.

Plaintiff William E. Schleve (hereafter "Plaintiff") at all material times was an

"employee" of Courtesy, within the meaning of ERISA §3(6), 29 USC § 1002(6), until Courtesy

terminated him from employment on May 3, 2019. Plaintiff at all material times was a "covered

employee" as defined by ERISA §607(2), 29 USC § 1167(2), was at all material times a

"participant" as defined by ERISA §3(7), 29 USC § 1002(7), and is and was at all material times

a citizen and resident of Oregon.

### III. FACTUAL ALLEGATIONS

7.

Plaintiff realleges paragraphs 1 through 6 above.

8.

Courtesy established and at all material times maintained an "employee benefit plan" or

"welfare plan," as defined by ERISA §3(1), 29 USC § 1002(1), for the benefit of its employees

as participants, including Plaintiff, through the purchase of insurance for medical and hospital

care or benefits, or benefits in the event of sickness (hereafter the "Plan").

9.

Plaintiff worked for Courtesy two different periods of time, with his second period of

employment beginning on or about August 3, 2015, and ending on May 3, 2019.

10.

Plaintiff was a covered participant under the medical and hospital portions of Courtesy's

Plan during all times relevant to this matter.

11.

From approximately January 2019 and continuing through approximately mid-July 2019, Plaintiff suffered from a serious but undiagnosed medical condition in the form of a pulmonary embolism.

12.

From time to time over the period of approximately January 2019 through approximately mid-July 2019, Plaintiff's undiagnosed pulmonary embolism caused him to suffer shortness of breath, dyspnea on exertion, chest heaviness, wheezing, coughing, irregular heartbeat and edema in both legs and feet, and dangerous swelling, among other symptoms.

13.

In the first half of 2019, while Plaintiff was suffering from the undiagnosed pulmonary embolism, employed by Courtesy and a participant in Courtesy's Plan, he consulted with his medical provider, Kaiser Permanente, with respect to his resulting health concerns.

14.

Early on the morning of February 27, 2019, Plaintiff consulted by telephone with an individual Kaiser Permanente medical provider with respect to his symptoms of coughing, congestion, slight wheezing and chest heaviness.

15.

On March 21, 2019, a medical doctor examined and treated Plaintiff at a Kaiser Permanente medical facility for tachycardia and apparent upper respiratory infection, including coughing and shortness of breath.

16.

On March 22, 2019, Plaintiff repeatedly communicated again with Kaiser Permanente

medical professionals concerning his health conditions.

17.

On March 24, 2019, a Kaiser Permanente licensed practical nurse sent a message to

Plaintiff advising him to speak with an advice nurse to facilitate the advice nurse helping to

triage Plaintiff's conditions and efficiently direct the best treatment for Plaintiff.

18.

On March 25, 2019, a Kaiser Permanente pharmacist spoke to Plaintiff about Plaintiff's

health conditions and the medication he had been prescribed.

19.

On April 9, 2019, Plaintiff again communicated to a Kaiser Permanente medical doctor

concerning Plaintiff's diminished lung capacity when carrying objects and his resulting need for

a written directive from the physician for Plaintiff to present to his employer for reasonable

accommodation in the form of a parking space close to his office.

20.

On May 3, 2019, Courtesy terminated Plaintiff from employment for other than "gross

misconduct" as referenced in 29 USC §1163(2).

21.

On May 3, 2019, while at the dealership after Courtesy terminated him from

employment, Plaintiff  asked Shawn Reece, Courtesy's Human Resources Director, for his final

paycheck and documents concerning his right to continue health insurance coverage under

Courtesy's Plan under COBRA.  Ms. Reece told Plaintiff that she was working on it but that it

would be a couple of hours before she could get it to him. Plaintiff did not receive his final paycheck nor any documents concerning his right to continue benefit coverage under Courtesy's Plan under COBRA on May 3, 2019.

22.

Plaintiff returned to Courtesy's dealership on May 4, 2019, and received his final paycheck from Courtesy but Courtesy did not provide Plaintiff any information concerning his right to continue health insurance coverage under Courtesy's Plan under COBRA.

23.

Plaintiff understood that by virtue of Courtesy's termination of him on May 3, 2019, absent his obtaining continuation health insurance coverage under Courtesy's Plan through COBRA, his health insurance coverage under Courtesy's Plan would extend only through May 31, 2019.

24.

On two occasions in May 2019, after receiving his final paycheck from Courtesy, Plaintiff telephoned Ms. Reece and, unable to speak with her, left voicemail messages for her asking that Courtesy provide him with information concerning his right to continue health insurance coverage under Courtesy's Plan under COBRA. Ms. Reece did not return Plaintiff's telephone calls.

25.

On the third occasion Plaintiff telephoned Ms. Reece, he reached her and again asked her for Courtesy to provide him with information concerning his right to continue health insurance coverage under Courtesy's Plan under COBRA. In that telephone call, Ms. Reece told Plaintiff that Courtesy did not have to provide him with information concerning his right to continue

health insurance coverage under Courtesy's Plan under COBRA, stating that it was not
Courtesy's responsibility to do so.

26.

At no time prior to November 19, 2021, did Plaintiff receive information from Ms. Reece
or anyone else associated with Courtesy concerning his right to continue benefit coverage under
Courtesy's Plan under COBRA.

27.

Effective June 1, 2019, Plaintiff no longer had health insurance coverage under
Courtesy's Plan and that month his health conditions continued to deteriorate.

28.

Initially, following the cessation of his health insurance coverage under Courtesy's Plan
effective June 1, 2019, Plaintiff avoided seeking treatment for his health conditions out of the
concern that, without health insurance coverage, he might not be able to afford to pay for the
expense for such medical treatment.

29.

However, by the evening of June 23, 2019, Plaintiff was in such medical distress, and so
hoped that he would receive medical advice over the telephone without being charged, that he
conveyed  a message to one of the Kaiser Permanente physicians who had  previously treated
him stating: "I'm not sure what to do?  I got fired and never received anything about Cobra.
There is something wrong.  I need to see a Doctor.  Its [sic] basically the same stuff as before.
Except now my feet are swollen.  Not bad enough I can't walk.  Also I am having trouble with
breathing.  I'm okay unless I exert myself.  My number is still the same thank you.  Will Schleve
. . . ."

30.

On June 28, 2019, at 12:51 a.m., Plaintiff left another message with one of the Kaiser Permanente medical doctors who had previously treated him stating that: "I'm scared.  I will call in the morning or 911 tonight if it gets worse. . . . "

31.

Later, at approximately 10:00 a.m., on June 28, 2019, Plaintiff spoke by telephone with a Kaiser Permanente medical provider concerning his conditions.  In that conversation, Plaintiff complained of, among other symptoms, shortness of breath, weakness, left leg swelling and left foot redness.  The Kaiser Permanente medical provider recommended that Plaintiff come to a Kaiser Permanente medical facility to be examined by a physician at 4 p.m. that very day and Plaintiff agreed that an appointment with a Kaiser Permanente physician was warranted that day. The Kaiser medical provider convinced Plaintiff to seek emergent or urgent care for any emergent symptoms and advised Plaintiff that if his symptoms worsened or changed, including but not limited to, chest pain, worsening shortness of breath, and/or red lines/streaking from his left foot, that Plaintiff needed to telephone to get an additional assessment or seek medical care even sooner than his scheduled 4 p.m. medical appointment that day.   The medical provider noted that Plaintiff was going to call Kaiser Permanente membership services to see what the financial charges would be for his scheduled medical appointment that day given that Plaintiff no longer was covered by Courtesy's Plan.

32.

Plaintiff thereafter spoke to a Kaiser Permanente membership services representative. Based on the information he received from that representative, Plaintiff sent a message at 1:04 p.m. that day to the Kaiser Permanente physician who had been scheduled to examine him

stating: "Just what I figured, until I get my Cobra figured out I can't afford the appointment. If it doesn't get better I guess I will go to OHSU and see if I can get in there. Had Kaiser 4 years. Healthcare reform is needed. Thank you for your time."

33.

On Monday, July 1, 2019, having reviewed Plaintiff's message from the early afternoon of June 28, 2019, , his Kaiser Permanente physician caused a reply message to be sent to Plaintiff advising Plaintiff to contact Kaiser Permanente if he has any other health care needs.

34.

In a July 5, 2019, reply message, Plaintiff acknowledged the physician's suggestion that he contact Kaiser Permanente about his health care needs but indicated that he had no health insurance to defray the costs of medical care adding that: "I understand that I don't have insurance now after getting fired. If I need I will call 911. Until then I will tolerate not feeling well."

35.

As time went on, Plaintiff's medical conditions continued to worsen.

36.

On July 11, 2019, Plaintiff messaged his Kaiser Permanente treating physician that: "I am still having trouble breathing. I have talked to SS about filing for disability. Is there an open appointment today or tomorrow or should I go to Urgent Care? Thank you. Will Schleve."

37.

In response to this message, after members of the Plaintiff's Clinician's Healthcare Team were unable to reach Plaintiff to consult with him about his trouble breathing, on July 12, 2019, a Registered Nurse sent Plaintiff an electronic message asking him to telephone so that a team

member could discuss Plaintiff's current symptoms with him. In that message, the Registered Nurse advised Plaintiff that "[I]f you think you are having a medical or psychiatric emergency please go to your nearest hospital or call 911." The Registered Nurse also noted to Plaintiff that "it shows that you may not be a Kaiser member" and advised Plaintiff that if he needed to reinstate insurance coverage he should contact "membership services regarding your insurance needs."

38.

In acute distress, on the mid-afternoon of July 16, 2019, Plaintiff had his adult son drive him to a Kaiser Permanente urgent care clinic without an appointment to seek treatment by a physician where he complained of worsening shortness of breath.

39.

At that time, in addition to shortness of breath, he was found to have an elevated pulse of 111 at the outset of his treatment there which increased to 122 while he remained in urgent care. He was found to be suffering from swelling and edema from the lower legs to his feet in both legs.

40.

Physicians examined and tested Plaintiff over more than four hours in the urgent care clinic. Several of Plaintiff's test results were alarming, including his D-dimer blood test, an indicator of blood clots, which at 1,300 ng/mL was more than double the normal level. The BNP blood test was also very high at 5,680 pg/mL compared with the normal level of <=900 pg/mL, which indicated possible congestive heart failure. Based primarily on their examination of Plaintiff and the results of these two tests, in the early evening of July 16, 2019, physicians decided to transfer Plaintiff to a Kaiser Permanente hospital Emergency Department.

41.

Upon Plaintiff being admitted to the hospital Emergency Department that evening, Kaiser Permanente physicians diagnosed him as having systolic heart failure and suffering from an acute pulmonary embolism and diabetes, among other maladies.

42.

Plaintiff remained in the Kaiser Permanente hospital undergoing treatment for his conditions for three days.

43.

While Plaintiff was in the hospital on July 18, 2019, a Kaiser Permanente Care Coordinator noted based on a conversation with Plaintiff that after Courtesy discharged him from employment in May, Courtesy had not provided or would not provide him with "Cobra insurance continuation paperwork." The Care Coordinator then scheduled a Kaiser Permanente Social Worker to discuss with Plaintiff his newly diagnosed serious health conditions, which for several months had grown progressively worse without proper medical treatment, and his lack of health insurance to pay for treatment of these serious health conditions.

44.

At the Care Coordinator's direction, while Plaintiff was still in the hospital on July 19, 2019, a Kaiser Permanente Social Worker discussed with him payment for the extensive healthcare expenses associated with Kaiser Permanente's treatment of him. In that discussion, Plaintiff indicated that while he had been insured to receive medical treatment by Kaiser Permanente for 15 years, he currently had no health insurance. Plaintiff indicated to the Social Worker that after Courtesy terminated him from employment in May 2019, Courtesy did not

provide him with paperwork to enable him to continue his Courtesy group health insurance coverage though COBRA.

45.

The Social Worker had Plaintiff complete and sign a Kaiser Permanente Medical Financial Assistance Program form which the Social Worker submitted to the Kaiser Permanente Hospital Admitting Department for Plaintiff not to be charged for the health care services he had been receiving from Kaiser Permanente since his arrival at its medical facilities on July 16, 2019.

46.

In her meeting with Plaintiff in the hospital on July 19, 2019, the Social Worker also provided Plaintiff with an application to complete and submit as soon as possible to try to obtain coverage for health care services under the Oregon Health Plan.  The Social Worker also told Plaintiff that he should reapply for Kaiser Medical Financial Assistance for his scheduled August 1, 2019, follow up appointment with his primary care physician should he not be successful in becoming enrolled in the Oregon Health Plan by then.

47.

Later on July 19, 2019, after three days of treatment, testing, medication and observation, Plaintiff was released from the hospital.

48.

Between his discharge from its hospital on July 19, 2019, and July 30, 2019, Plaintiff continued to take medications and consult with Kaiser Permanente medical providers concerning treatment for his serious health conditions.

49.

Between July 19, 2019, and July 30, 2019, at the direction of the Kaiser Permanente
Social Worker, Plaintiff applied for health care coverage through the Oregon Health Plan.

50.

By July 30, 2019, Plaintiff was informed by the Oregon Health Authority that his income
from unemployment benefits exceeded by approximately $65 per month the income threshold
below which he would be eligible to receive  health care coverage through the Oregon Health
Plan.

51.

On July 30, 2019, Plaintiff messaged Kaiser Permanente indicating that he had been
denied health care coverage under the Oregon Health Plan, that some of  his prescribed
medications would run out in two days, that Courtesy refused to send  him paperwork for him to
continue health insurance under its Plan through COBRA, that Courtesy had told him that it did
not have to provide him with such COBRA paperwork, and that he had not received assurances
from Kaiser Permanente financial services that it would continue to provide him with  medical
treatment in light of his lack of health insurance.

52.

Later on July 30, 2019, a Kaiser Permanente Social Worker notified Plaintiff that because
he had been denied health coverage under the Oregon Health Plan, Kaiser Permanente's Medical
Financial Assistance Program would approve him to access health care and prescription
medications from Kaiser Permanente for a six-month period on the condition that Plaintiff speak
with one of its Financial Counselors or make another application to its Medical Financial
Assistance Program.

53.

Plaintiff so applied and was approved to receive access to health care from Kaiser Permanente for the six-month period.

54.

On or about October 30, 2019, Plaintiff was hired by an employer to work in Madras, Oregon.

55.

Under the terms of his new employment in Madras, Oregon, Plaintiff was not eligible to be covered by that employer's group health insurance plan until after 90 days of continued employment by him with it.

56.

In or about late January or early February 2020, Plaintiff was permitted to and did enroll in his new employer's group health insurance plan.

57.

Between July 30, 2019, and Plaintiff's enrollment in his new employer's group health insurance plan in 2020, Plaintiff continued to need and receive medical advice, treatment and prescription medications from Kaiser Permanente under its Medical Financial Assistance Program.

58.

Kaiser Permanente had no medical facilities in the Madras, Oregon area and consequently when Plaintiff needed in-person access to medical care during this time, he had to travel to the greater Portland, Oregon area to receive it.

59.

Prior to November 19, 2021, Courtesy never provided Plaintiff with information concerning his right to continue health insurance coverage under Courtesy's Plan pursuant to COBRA and never complied with Plaintiff's request for it to provide him with such information.

IV. STATEMENT OF CLAIMS

First Claim for Relief

(29 USC § 1132(c)(1)(A) - Penalties for Failure to Provide Notice)

60.

Plaintiff realleges paragraphs 1 through 6 and 8 through 59.

61.

Courtesy's termination of Plaintiff from employment on May 3, 2019, constituted a "qualifying event" pursuant to ERISA § 603, 29 USC § 1163.

62.

Courtesy did not terminate Plaintiff for "gross misconduct" on May 3, 2019.

63.

Pursuant to ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), by virtue of its termination of Plaintiff from employment on May 3, 2019, for other than gross misconduct, Courtesy had an affirmative duty to timely provide Plaintiff with information concerning his right to elect to continue benefit coverage under Courtesy's Plan.

64.

Following its termination of Plaintiff from employment on May 3, 2019, Courtesy violated ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), by failing to provide Plaintiff with information concerning his right to elect to continue benefit coverage under Courtesy's Plan.

65.

As a result of Courtesy's violation of ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), Plaintiff was deprived of his right to elect COBRA continuation coverage under the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168.

66.

As a further result of Courtesy's violation of ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), Plaintiff suffered varying harms including:

a)      Foregoing and delaying reasonable and necessary medical care;

b)      Exacerbation of underlying medical conditions due to foregoing and delaying reasonable and necessary medical care; and

c)      mental anguish.

67.

As a further result of Courtesy's violation of ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), Courtesy is liable to Plaintiff pursuant to ERISA §§ 502(c)(1)(A), 29 USC § 1132(c)(1)(A), and 29 CFR § 2575.502c-3 for civil penalties of $110 per day from June 18, 2019 forward, which as of November 18, 2021 totaled $97,240.

68.

As a further result of Courtesy's violation of ERISA § 606(a)(4)(A), 29 USC § 1166(a)(4)(A), Courtesy is liable to Plaintiff for his reasonable attorney's fees and costs pursuant to ERISA § 502(g), 29 USC § 1132(g).

Second Claim for Relief

(29 USC § 1132(c)(1)(B))

69.

Plaintiff realleges paragraphs 1 through 6, 8 through 59 and 61 through 62.

70.

On May 3, 2019, the day Courtesy terminated Plaintiff from employment for other than "gross misconduct," Plaintiff requested that Courtesy provide him with information concerning his right to elect to continue health insurance coverage under Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168.

71.

Within 30 days of his request on May 3, 2019, and continuing through November 18, 2021, Courtesy failed to comply with Plaintiff's request to provide him with information concerning his right to elect to continue benefit coverage under Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168.

72.

As a result of Courtesy failing to provide Plaintiff, within 30 days of his May 3, 2019, request, with information concerning his right to elect to continue benefit coverage under Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168, Plaintiff was deprived of his right to elect COBRA continuation coverage under the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168.

73.

As a result of Courtesy failing to provide Plaintiff, within 30 days of his May 3, 2019, request, with information concerning his right to elect to continue benefit coverage under

Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168, Plaintiff suffered varying harms including:

      a)      Foregoing and delaying reasonable and necessary medical care;

      b)      Exacerbation of underlying medical conditions due to foregoing and delaying reasonable and necessary medical care; and

      c)      mental anguish.

74.

As a further result of Courtesy failing to provide Plaintiff, within 30 days of his May 3, 2019 request, with information concerning his right to elect to continue benefit coverage under Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168, Courtesy is liable to Plaintiff pursuant to  ERISA §§ 502(c)(1)(B), 29 USC § 1132(c)(1)(B) and 29 CFR § 2575.502c-3 for civil penalties of $110 per day from June 3, 2019 forward, which as of November 18, 2021 totaled $98,780.

75.

As a further result of Courtesy failing to provide Plaintiff, within 30 days of his May 3, 2019 request, with information concerning his right to elect to continue benefit coverage under Courtesy's Plan pursuant to the continuation coverage provisions of ERISA §§ 601-608, 29 USC § 1161-1168, Courtesy is liable to Plaintiff for his reasonable attorney's fees and costs pursuant to ERISA § 502(g), 29 USC § 1132(g).

V. <u>PRAYER</u>

WHEREFORE, Plaintiff prays for the relief requested in each of his claims for relief

alleged above and for such other relief that the Court deems just and equitable.

DATED this 3rd day of May, 2022.

LAW OFFICE OF BRIAN DONALD POTTER

By   <u>*/s/ Brian Donald Potter*</u>
    Brian Donald Potter, OSB#843259
    dpotter@nwemployeelaw.com
    Attorney for Plaintiff William E. Schleve